98    543
152   366

HENRY N. ANDERSON AND RUSSELL H. GRIFFIN v. THE NORTHERN NATIONAL BANK OF BIG RAPIDS, MICHIGAN, ET AL.

*Bills and notes—Bona fide holder—Collateral security—Subrogation—Notice—Guaranty—Assignment of mortgage.*

1. Where a note and a mortgage, given to secure the payment of part of the purchase price of a tract of pine land, are assigned as collateral security for a lesser debt, without notice to the assignees of a guaranty by the mortgagee that the land will cut a certain amount of timber, and of his agreement to refund a stated sum per thousand feet for all shortage, the assignees will be protected as *bona fide* holders of the securities, against any claim under the guaranty, to the amount of their debt only.

2. A second assignee, to whom the note and the mortgage are sold and assigned by the mortgagee with notice of the guaranty, has the right to pay the balance due the first assignees, and, on receiving an assignment from them of the securities, will be subrogated to their rights as a *bona fide* holder to the amount paid, but no further.

3. The purchasers of the land are not required to remove timber from swamps at a cost exceeding its value, or to remove every stick of merchantable timber from the high lands, in order to establish a right of action for a breach of the guaranty; but the guarantor cannot be charged with the amount of timber in said swamps which it is impossible to remove.

4. Facts communicated to the second assignee at the time of the assignment, amounting to notice of the guaranty, are as effect-

ive as if the guaranty had appeared on the face of the mortgage.

Appeal from Kent. (Grove, J.) Argued October 6, 1893. Decided February 6, 1894.

Bill to declare a note and a mortgage paid, and enjoin the prosecution of a suit for their collection. Defendants Northern National Bank and Stearns appeal. Decree modified and affirmed. The facts are stated in the opinion.

*FitzGerald & Barry,* for complainants.

*M. Brown* (*John W. Champlin,* of counsel), for appellants.

GRANT, J. In 1886, defendant Baker was the owner of a certain tract of pine land and a saw-mill, and certain personal property used in carrying on the business of the mill and lumbering. Complainants purchased this property at an agreed price of $50,000, the terms having been consummated March 23, 1886. The verbal negotiations were carried on between complainant Anderson and Baker. Some correspondence passed between the parties, which is here given. The first letter was written by Mr. Anderson to Baker, and read as follows:

"In your estimate of pine, did you estimate anything below 10 inches diameter? Please answer at once. And, if the actual cut falls below your estimate of 13,000,000, will you guarantee to make the shortage good at $3.50 per thousand feet? If you will do so, I will take it, if satisfactory after I look the property over."

March 15, 1886, Mr. Baker replied:

"*Dear Sir:* In my estimate of the pine I figured in 8-inch timber, and, if the actual cut in boards falls below 13,000,000 feet, I will make the shortage good at $3 per M. I would like to know as soon as possible, as I am delaying my preparation on summer work, awaiting your decision."

March 18, Anderson replied:

"*Dear Sir:* Replying to your letter of 14th, we will take the property at the price given, and on the basis of 13,000,000 feet, providing you will guarantee that amount, and make the shortage good at the rate of $3.50 per 1,000 feet. If the amount is there, you have nothing to risk. Please let us know your decision at once."

March 23, Baker replied:

"*Dear Sir:* I accept your proposition, and would like to have you come here at your earliest convenience to close the trade. Let me know by return mail when you will be here."

The transfer papers were executed April 2, 1886, but were dated March 22 previous. During the negotiations, complainants made an examination of the lands, and sent a competent timber estimator to examine the timber, and report the amount of his estimate. Baker executed the proper deeds of conveyance, and complainants paid $5,000 in cash, and executed to Baker a note and mortgage of $45,000, the balance of the purchase price. The note reads as follows:

"$45,000. BIG RAPIDS, MICH., March 22, '86.

"On or before two years after date we jointly and severally promise to pay to the order of La Fora S. Baker forty-five thousand dollars at Northern National Bank, with interest at seven per cent. annually. Value received.

"HENRY N. ANDERSON.
"R. H. GRIFFIN."

There were some imperfections in the title, which Baker agreed to remove before the papers were delivered. Baker was at this time, and had been for many years, the cashier of the defendant bank, and defendant Stearns was, and had been for many years, its president. Baker was a nephew of Stearns, and they had been engaged in several business transactions. It was agreed that these papers should be placed in the hands of Mr. Stearns, to be kept by him

98 Mich.—35.

until the imperfections of the title were removed.  He gave a receipt as follows:

"BIG RAPIDS, MICH., April 2, 1886.

"Received of H. N. Anderson and R. H. Griffin and L. S. Baker warranty deed from L. S. Baker and W. F. to said Anderson and Griffin, and note and mortgage from Anderson and Griffin to Baker; said Baker to produce an abstract of title showing clear title to said lands, and assign insurance on mill to Anderson and Griffin, and then note and mortgage to go to Baker, and deed to Anderson and Griffin.                              G. F. STEARNS, Pt."

These papers were received by Stearns as president of the bank, and deposited in the vault.  Complainants refused to purchase unless Baker would give a written guaranty as to the amount of timber.  This guaranty was executed at the same time, bears the same date as the other papers, and reads as follows:

"In consideration of Henry N. Anderson and Russell H. Griffin having purchased of me certain lands described in a deed made by me bearing this date, I hereby guarantee that the lands described in said deed, together with the logs now in Blue lake, will cut out 13,000,000 feet of pine boards or lumber, board measure, if properly handled and manufactured; and I hereby agree that if the said timber and logs are cut and manufactured in a proper manner, and not allowed to go to waste, that I will refund to them the sum of $3.50 per 1,000 feet for the number of feet it falls short of 13,000,000 feet.  This agreement is only good for two years and six months from this date."

This guaranty was inclosed with the papers deposited with Mr. Stearns.  Before the papers were finally passed, the mill was destroyed by fire, and the insurance was collected by Baker, and, by the understanding of all parties, was indorsed upon the note.  The complainants built a new mill, and proceeded to cut and manufacture the timber.

On February 12, 1887, Baker assigned this note and

mortgage to Palmer & Brown, executors of the last will of John F. Brown, deceased, as collateral security for a loan of $20,000 which they had made to Baker upon a note which was indorsed by Mr. Stearns. Complainants made three payments to Palmer & Brown while the note was so held by them, the last payment, of $6,000, being made January 6, 1888. Palmer & Brown had no knowledge of the written guaranty given by Baker, and are conceded to be *bona fide* holders and pledgees of the note and mortgage.

Defendant Baker was indebted to the defendant bank as maker and indorser of commercial paper to the amount of $30,000. Some of this paper was made by Baker as principal, and indorsed by the Baker Lumber Company, and the balance was made by the Baker Lumber Company, and indorsed by Baker. Baker was the principal stockholder, and the controller and manager, of the lumber company. The financial business of this company was done at the defendant bank. August 3, 1887, Baker assigned the note and mortgage given by complainants to defendant Stearns in trust for the bank, and at the same time wrote to Palmer & Brown, directing them that they should also assign them to Stearns in like manner when the $20,000 was paid. January 23, 1888, there was still due from Baker to Palmer & Brown the sum of $4,507.26. This sum was paid by the bank, through Mr. Stearns, to Palmer & Brown, who, in accordance with the instructions previously received from Baker, assigned the mortgage to Stearns as trustee, and indorsed the note over to him without recourse.

Complainants filed the bill in this cause April 9, 1888, claiming that they had cut and removed the timber as provided for in the guaranty; that there was a shortage of over 6,000,000 feet; that Baker is insolvent; that the defendant bank purchased with knowledge of the guaranty and the arrangement between complainants and Baker; that

they have overpaid the amount actually due,—and pray that the note may be declared paid, and the defendant bank may be perpetually enjoined from prosecuting a suit to recover the amount. The decree was for the complainants. The further statement of facts will be found in connection with the points raised.

1. Palmer & Brown received this note and mortgage in good faith, and without any knowledge that it was burdened with any infirmity as between complainants and Baker, or any information to put them upon inquiry. They were therefore *bona fide* holders, and their interest in it is entitled to protection, both in their own hands, and in the hands of their assignees or indorsees. A subsequent holder, though he had knowledge of such infirmity, took the same title, and succeeded to the same rights, which his indorser had. The *bona fide* holding, when once attached, continues in the hands of subsequent holders. *Shaw v. Clark*, 49 Mich. 384; *Kost v. Bender*, 25 Id. 515; *Wood v. Starling*, 48 Id. 592. This is the well-established rule, and needs no further citation of authorities. The defendant bank had the right to protect its interests by payment to Palmer & Brown of the amount due them, even if it had knowledge of the guaranty of Baker, and of the defense which complainants might make as against him or his assignees with notice. This rule is founded in good sense, and we find no authority to the contrary. The rights between complainants and Baker were not then determined, and the extent of Baker's liabilities under the guaranty was not known. If, upon settlement, either amicably or by suit, any amount was found due to Baker, the bank would be entitled to it. It follows that the decree is erroneous, in that it did not provide for the repayment by complainants to it of the amount paid by the bank to Palmer & Brown.

2. But this rule, in the present case, can be carried no

further than to protect the amount thus paid.    The *bona fide* character of the holding of Palmer & Brown attached only to the extent of their holding, except in the hands of one who should purchase under a foreclosure of the pledge.    The rule is correctly stated by the learned counsel for the defendants that—

"A holder who derives his title to a bill through a *bona fide* holder for value, without notice, has all the rights of such *bona fide* holder against the acceptor and all prior parties, although he himself may have given no value, and may be affected with notice."

The numerous authorities cited sustain the proposition. But the complete answer to the attempt to apply this rule to the present case lies in the fact that Palmer & Brown did not own the absolute title to the note, and that the bank knew this, and obtained an assignment from Baker while it was in the hands of Palmer & Brown as pledgees. The title of the bank is no other or different than it would have been if Baker himself had paid Palmer & Brown, and then made an assignment to the bank.    A pledgor does not part with his title, and the only method in which Palmer & Brown could have deprived Baker of his title to the note and mortgage would have been by a proper foreclosure of their lien upon them.

3. It is not contended that complainants could not defend against this note and mortgage in the hands of Baker to the extent of the deficiency at $3.50 per thousand.    This is true, whether the defense be made upon the ground of fraudulent representations or in reliance upon the guaranty, or whether the representations were made by Baker in good or bad faith.    Such defense is not in the nature of a set-off, but of recoupment.    Baker's representations as to the amount of timber were untrue.    Complainants had the right to rely upon them, whether they were written or verbal, or whether contained in a written or a verbal guaranty.    They

did rely upon them, and are entitled to recoup their damages as against Baker and his assignees affected with notice. Unfortunately for the complainants, they did not include the guaranty in the mortgage or note, but in a separate paper. They therefore placed in the hands of Baker the power to transfer the note and mortgage to a *bona fide* purchaser for value, and thus cut of all right of defense. That there was a large shortage in this timber was conclusively established, and it seems impossible to believe that Baker was honest in making these representations. The next important question, therefore, to determine, is whether the bank was a *bona fide* holder of the note and mortgage. If the bank had notice of the terms of the sale by Baker to complainants, it is not a *bona fide* holder, and in its hands complainants have the same defense that they would have as against Baker. This rule is too well established to require the citation of authorities.

The testimony is conflicting. It was taken in open court, where the circuit judge saw the witnesses, and had peculiar opportunities to determine the credibility to be given to them. In 1887, complainants became convinced that there was a large shortage in the timber, and on November 23, 1887, they gave the guaranty to their attorney, John Lewis, directing him to go to Big Rapids and investigate the matter. He went to the office of Palmer & Brown, where he found Mr. Palmer, and showed him the guaranty. Mr. Palmer telephoned to Mr. Stearns, who came to his office. Mr. Lewis told him the purpose of his visit, and testifies that it is his recollection that he showed him the guaranty. Mr. Stearns denies this, but admits that he then learned that there was a misunderstanding about the timber. The note and mortgage were then in the hands of Palmer & Brown. At this time the relations between Baker and the bank, as to his indebtedness to it, had not been changed. The bank still retained all of Baker's notes.

On January 24, upon receipt of the note and mortgage from Palmer & Brown, entries were made upon the books of the bank crediting the Baker Lumber Company with the payment of one note of $7,500, indorsed by Baker, and Baker with two notes of $5,000 each, indorsed by the Baker Lumber Company, none of which notes were then due. The balance was credited to the Baker Lumber Company. Complainant Griffin and another witness testify that in a subsequent conversation with Stearns he admitted that he first knew of this guaranty at the time of the conversation with Mr. Lewis, above referred to. Soon after the sale to complainants, Baker's connection with the bank was severed, and he removed to Chicago. Correspondence passed between them in regard to the transfer of this note and mortgage to Stearns in trust for the bank, which correspondence was destroyed by the deliberate act of Stearns and Baker. Stearns wrote to Baker to destroy his letters. The excuse given is that the letters referred to private matters aside from this transaction. The intimate relations existing between them cannot be overlooked, from which it may be fairly presumed that Mr. Stearns had knowledge of Mr. Baker's affairs. After a careful examination of the record, and in view of the better opportunity of the learned circuit judge to arrive at the truth of the matter, we do not feel impelled to set aside his conclusion, in the face of so palpable a conflict of evidence, and so much in the conduct of Baker and Stearns to weaken their evidence.

4. It is insisted that complainants did not properly handle and manufacture this timber, and that there is still a large amount upon the land. The greater part of the evidence in this record of 3,000 pages relates to this subject. Many witnesses who had examined the land testified in behalf of the respective parties. The lands are situated on sections 25 and 36, township 16 N., range 14 W., and sections 8,

19, 22, 28, 30, 32, and 34, township 16 N., range 13 W. It is conclusively established that the logs cut were properly manufactured into lumber, and the amount thus manufactured is shown definitely. It is also established by the complainants' evidence, and by some of the defendants' witnesses, that the timber was well cut on the E. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$, and the S. $\frac{1}{2}$ of the S. E. $\frac{1}{4}$, of section 36, and the S. $\frac{1}{2}$ of section 30. As to the manner of cutting upon the other lands there is a irreconcilable conflict of evidence. To review it would be unprofitable to any but the parties interested directly. Experienced woodsmen were sent by both parties over the lands, and they have given the results of their examinations. Some did not examine the trees with a view to determining their merchantable character. A large portion of the trees was down timber, caused by windfalls, and much of it was down when the sale was made. A careful examination by cutting and sawing into it was necessary to determine its character. The most of the land had been cut over before the sale, some once, and a part twice, and the largest trees taken. A considerable part of the land was swamp, with large pine trees scattered through it. The evidence on the part of the complainants is quite convincing that it was impracticable to remove much of this timber in the swamps, and that the cost of removal would exceed its value. Some of this timber was left upon the land, but it is impossible to determine from the record approximately how much, since the witnesses on neither side appear to have kept this left in the swamp separate from that left on the high land. It was certainly to the interest of the complainants to cut all the merchantable timber practicable. There is no motive apparent for their leaving it on the land. They learned in 1887 that Baker was pecuniarily irresponsible, and that their note and mortgage were in the hands of third parties, with the claim that they were *bona fide*

holders. Their interest, therefore, lay in realizing all they could from the timber. We think it shown, by a fair preponderance of the evidence, that they had handled and manufactured the timber in accordance with the terms of the guaranty. They were not required to remove any timber the cost of which would exceed its value, nor to remove every stick of merchantable timber from the high lands, in order to establish a right of action against Baker. A substantial compliance is all that was required.

5. The next question to be determined is, how much was the deficiency? The mill tally of the lumber manufactured and sold amounted to 6,253,785 feet; there remained at the mill 84,300,—making a total of 6,338,085 feet of timber actually taken from the land.

The original purchase by Baker in October, 1884, the amount he then purchased, and the amount sold by him before the sale to complainants, have an important bearing upon the amount there was upon the land, as well as upon the fraud perpetrated upon the complainants. Baker purchased this land from one Antoine E. Cartier. The purchase included the saw-mill, buildings, lumber camps, and outfits, 19 oxen, 7 pairs of horses, 1 span of mules, 6,500,-000 feet of lumber at the mill, and 1,500,000 feet of saw-logs in the lake, for which he paid the sum of $80,000. He testified that Cartier represented to him that there were 11,000,000 feet of standing pine without section 8. He manufactured the logs then in the lake into lumber, except about 200,000 feet. He thus had for sale and sold from his purchase 7,800,000 feet. He testified that he could not tell how much he received for it, but admitted that he received at least $10 per thousand. He therefore received at least $78,000 for the lumber alone. In addition to this he sold the oxen, the horses, the mules, and some of the other personal property, for which he realized about $5,000. If his story be true, he therefore purchased 21,000,000 feet

of pine, including the lumber and logs on hand, the saw-mill and outfit, and all the other personal property, for $80,000, from which, in a short time, he realized more than that amount, and still had some of the personal property left, and the entire tract of pine.    The story is improbable that Cartier represented, or that he (Baker) believed, that there were 13,000;000 feet on the land. Cartier was an experienced lumberman, and must be cred-ited with the capacity to know the value of his property, and to insist upon a reasonable price.    His story is much more consistent with the truth than is that of Baker.    He testified that he made an estimate of the timber in July, 1884, and that his estimate was 6,600,000 feet; that before he sold to Baker he had taken off 1,200,000; and that he told Baker that there were about 5,000,000 feet left.

Complainants, before purchasing, sent one Jacob Lowe, who had had 25 years' experience in manufacturing and estimating timber, to examine and report upon these lands. He made an examination by 40's, and reported that there were a little over 5,400,000 feet.    Anderson informed Mr. Baker that he did not think there was any such amount upon the land as 13,000,000 feet; that it was small timber, and such as he had not been used to.    Baker replied that he knew more about the land, that he had been operating in that country, and that it would cut about 13,000,000 feet.    Baker had also removed some of the timber.    His witness Raub testified that he had cut and removed from one piece over 290,000 feet.

Baker, in his representation to complainants that there were 13,000,000 feet, claims to have relied upon two esti-mates, made by Raub and one Hemphill.    Raub's estimate was 10,896,000 feet; Hemphill's, 10,870,000.    To these estimates Baker added about 20 per cent., claiming that timber estimated by Doyle's rule will overrun from 20 to 30 per cent.; and the evidence fairly supports this claim.

But Raub's testimony showed that neither in his original estimate nor in his estimate of the amount left upon the land by complainants did he make any attempt to arrive at the amount of merchantable timber. His testimony, therefore, is of but little value, especially in view of the fact that the lands had been before cut over, and, presumably, the best timber taken. Hemphill was not a witness, and there is no evidence as to the manner in which he made his examination. We regard these estimates, therefore, as of no value in determining the amount of merchantable timber, or in forming an honest basis for the representations made by Baker.

Neither the bank nor Baker can be charged with the amount of pine in the swamps which it was impossible to remove. Baker made no representations in this regard, and complainants assumed all risks of the cost of removal. If, including the amount which complainants must yet pay, as above stated, they had not paid for the full amount of all the timber there was upon the land, it would be necessary to determine the amount there was in the swamps, and probably to remand the case for further proofs upon this point. But we think that they have overpaid. The amount due when the note and mortgage were received by the bank was $23,089.12. Deducting $4,507.26, the amount paid by the bank to Palmer & Brown, there is left the sum of $18,581.86. We do not think that the shortage can be fairly estimated at less than 5,500,000 feet, which, at $3.50 per thousand, amounts to $19,250. This leaves the complainants out over 1,000,000 feet over the amount they have actually cut and manufactured.

6. Counsel for defendant concede that Mr. Stearns was acting for the bank, and that notice to him was notice to the bank; but they argue that Stearns could not be chargeable with bad faith in purchasing the paper, because—

(1). He was acting in pursuance of a previous agreement,

made before any question had arisen as to whether there would be a shortage.

(2). By the terms of the guaranty, Baker agreed to refund,—"that is, to pay back to them at $3.50 per thousand."

The previous agreement referred to was simply a parol promise on the part of Baker, made several months previous to the assignment. This promise was of no binding force, and was of no avail to the bank until the execution of the assignment. Counsel cite, among other authorities, *Howry v. Eppinger,* 34 Mich. 34, and *Miller v. Finley,* 26 Id. 254. They quote the language in *Howry v. Eppinger,* as follows:

"It is not the duty of parties about to purchase negotiable paper to make inquiries as to possible defenses, unless, either from something appearing upon the face of the paper, *or from facts communicated to them at the time,* they could not honestly purchase without making further inquiry; in other words, that they acted in bad faith."

From this statement of the law, it appears that the facts communicated at the time of the purchase have the same effect as facts appearing upon the face of the paper. This is undoubtedly the rule, as established by the authorities, which will be found collated in the note to *Miller v. Finley.* Had the terms of this guaranty been stated in the note, or in the mortgage, which was delivered to Stearns simultaneously with the note, it must be conceded that the bank would have taken it subject to the rebate for shortage. The same result follows if the bank had actual notice of the guaranty.

The transaction is not susceptible of the construction that complainants agreed to pay the note absolutely, and then look to the personal responsibility of Baker for the deficiency, and a purchaser had no right to act upon such a construction.

The decree must be modified to accord with this decis-

ion. The defendant bank will recover one-half of the costs of this Court.

McGRATH, C. J., LONG and HOOKER, JJ., concurred. MONTGOMERY, J., did not sit.