BUTE et al. v. WILLIAMS et al.

(Court of Civil Appeals of Texas. El Paso. Dec. 4, 1913. Rehearing Denied Jan. 8, 1914.)

1. APPEAL AND ERROR (§ 742*)—ASSIGNMENTS OF ERROR.

Assignments of error, complaining of findings, without pointing out wherein they are wrong, with subjoined statements making no reference to the record, but only to the statement at the beginning of the brief, cannot be considered.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

2. BROKERS (§ 65*)—RIGHT TO COMMISSIONS—FALSE REPRESENTATIONS.

The buyer having no means, so that his notes given for the purchase price were worthless, the broker, who repeated to the seller, though in good faith, with intent to induce a sale, and with the result of doing so, the false and reckless statements of the buyer as to his financial responsibility, is entitled to no commissions.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 48–50; Dec. Dig. § 65.*]

3. BILLS AND NOTES (§ 335*) — PURCHASE FROM INNOCENT HOLDER—RIGHTS OF PURCHASER.

A purchaser of notes, with notice of their infirmity, from a bona fide holder of them as collateral for a loan acquires such rights, and only such rights therein as his seller had, that is, an interest to the extent of the loan.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 817; Dec. Dig. § 335.*]

4. BILLS AND NOTES (§ 362*) — INNOCENT HOLDER—PURCHASE BY PRIOR HOLDER.

A holder of a note in whose hands they are unenforceable does not acquire it free of defenses by transferring it to an innocent holder and then repurchasing it from him; and this though he repurchases with money furnished by another therefor, on their agreement that the other should share in the profits because of the loan.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 937–943; Dec. Dig. § 362.*]

Appeal from District Court, Harris County; Norman G. Kittrell, Judge.

Action by James H. Bute against H. G. Williams and others. Judgment for defendant Williams, and plaintiff Bute and others appeal. Affirmed.

Stewarts and R. W. Houk, both of Houston, for appellants. W. J. Howard, Hutcheson & Hutcheson, L. R. Bryan, and Chas. Warnken, all of Houston, and Barber & McKee, of San Marcos, for appellee.

HARPER, J. This action was brought by appellant Bute to recover the principal and interest due on certain notes, aggregating $3,500, to foreclose the vendor's lien on the land sold, and for which the notes were executed as consideration, against H. G. Williams, C. C. Waller, and C. F. Bates, defendants.

Plaintiff alleged that on June 29, 1910, defendant Waller executed and delivered to defendant H. G. Williams certain promissory notes aggregating $150,000, being the pur-

---

chase price of 10,000 acres of land—a vendor's lien was retained—the first nine due one year after date, etc.; that C. F. Bates, a real estate agent, made the deal, and that seven notes, aggregating $3,500, were assigned and transferred to said Bates in payment of his commission for making the sale; that thereafter, before maturity, Bates assigned the said last notes to the Houston National Exchange Bank as collateral for a loan; that plaintiff purchased from bank; that all of said notes provided that failure to pay any one shall, at the option of the holder, mature all the notes that day given by Waller to Williams; prayed for judgment for notes, etc., as innocent purchaser from bank.

H. G. Williams answered that by reason of fraud practiced upon him by said C. F. Bates and C. C. Waller at the time of their execution, in this: that Bates represented that he could sell a tract of land owned by him for the sum of $150,000 to a wealthy and responsible man, and that he agreed to allow 5 per cent. commission on the sale. Believing and relying upon the representations so made, the sale was consummated to C. C. Waller and notes executed for the whole of the purchase price. That the notes sued on were transferred to plaintiff long after maturity and long after the entire series of notes had been declared to be due, and that the notes sued on were taken by plaintiff with full knowledge; wherefore, plaintiff has no cause of action for foreclosure of vendor's lien, etc. Further alleges that plaintiff is not the owner of the notes, but has an agreement with said Bates to become the ostensible owner and to institute this suit, that he may avoid the defenses which exist against their collection. By cross-action makes Louis R. Bryan, Chas. A. Warnken, Fred E. Hatey, S. W. Davis, and F. Z. Kitterman, Louis C. Kitterman, W. J. Wiley, and the Hay City Land Company and the Blanco Land & Cattle Company, and George Dowell, parties defendant, and alleges for cause of action, after describing the way the sale of land and execution of notes were brought about at length, he charges that the purchaser, Waller, failed to perform any of the promises made, charges collusion between Bates and Waller, and prayed that plaintiff take nothing by the suit, and that he have judgment canceling the deed and notes and removal of cloud, etc.

The findings of fact by the trial court being a clear and comprehensive statement of all the essential facts of the case as plead, we copy same in full and refer to it for further details of the questions involved for consideration in this opinion. C. C. Waller alleged that the notes sued on were without consideration and void, and prayed that his contract be canceled. The others made parties to the suit have been disposed of by the trial court, and they have not appealed from the action there taken. The case was tried by the court without jury, and judgment for defendant H. G. Williams upon his cross-bill, canceling notes and the lien on the land sought to be conveyed, and that plaintiff Bute take nothing. The findings of fact by the trial court are as follows:

"(1) The defendant Williams was the owner of 10,000 acres of land in Hays county and was desirous of selling it, and he and defendant Bates, and probably Waller, after going over to East Texas to look at some lands which had nothing to do with this case, and which was not necessary to inject into it, came back to Houston, and Williams said that he would give 5 per cent. if Bates would find him a purchaser willing and able to buy his 10,000 acres at $15 an acre.

"(2) I conclude that Bates had seen Waller, who was a very optimistic and visionary kind of a man to whom every prospect of a trade meant a fortune, and that Bates, relying upon representations made by Waller as to his prospects of being soon provided with large funds, represented to Williams that Waller was a man of large means and able to carry out the trade, and Williams, who was an old man and a countryman, thereupon agreed with Waller to sell him the land for $150,000 at $15 an acre, Waller assuming to pay, as a part of the purchase money, a note for $10,000 due to a certain Mrs. Davis, such payment to be made by Waller in three years, Waller to be credited to the extent of the said $10,000 and interest on the purchase money of the land under the contract between him and Williams, and, in order to assure and secure Williams in the payment of said note by Waller, Waller had the American Mortgage Company of Pittsburg, Pa., to convey to Williams, by deed, certain lots and lands situated in what is known as Penn City, Harris county, Tex.

"(3) Penn City was represented by an enterprise in the nature of a proposed establishment of rolling mills and other enormous establishments of like kind on about 3,000 acres of land on the banks of the Houston Ship channel, an enterprise which later vanished into thin air and wholly failed in every way.

"(4) It was provided that if Waller paid off the $10,000 note that the conveyance of the American Mortgage Company is to be treated as a mortgage and be released, but if he did not the lots should become the property of Williams.

"(5) The $143,895, being the difference between the $10,000 note and interest and the $150,000 to be paid for the land, was represented by a series of notes; the first nine for the sum of $1,000 each, and two notes for the sum of $500 each, due and payable a year from said date, and a large number of other notes payable as late as 13 years after date, with the usual right to elect to declare maturity of the whole series in the event of failure to pay any one of them.

"(6) Waller and Williams went together (Bates not going) to look over the land, and

Waller said that he would build a railroad from the I. & G. N. Railroad out to a place where they proposed to establish a city, and for that reason he could not pay the $10,-000 and the agreement was made to put up the Penn City lots in lieu of it.

"(7) It was later found that there was a mortgage retained by the Penn City on the lots, and in lieu of that, in order to protect Williams against that mortgage, Waller procured the American Mortgage Company to agree to deliver him $50,000 of 7 per cent. participating bonds of the American Mortgage Company as soon as they came from the hands of the printer, Waller releasing all of his interest in the lots, and Waller deposited with one Dowell in Austin the $50,000 receipt from the American Mortgage Company in order to guarantee that he would secure release from the mortgage on the lots or the lien retained, which lots were to stand in place of the cash payment that Waller was to make.

"(8) The deal was carried through on those terms, after much negotiation, and Waller executed a series of notes referred to in the pleadings, and as a part of his 5 per cent. commission, total being $7,500. The notes sued on in this action by Bute were turned over to Bates by Williams, and Bates proceeded to use them as collateral to borrow money from the Houston National Exchange Bank, depositing them first some time in April, 1911, and in that way this litigation has arisen.

"(9) The notes were dated June 29, 1910, marking the culmination of the various negotiations, but before that, on the 24th day of June, 1910, Waller and Bates and one Kitterman made a contract, in which they referred to the contract between Waller and Williams of date June 11, 1910, about the sale of the land, in which contract between Waller, Bates, and Kitterman, Bates and Kitterman agreed to organize a townsite company capitalized at $100,000 to develop a townsite on said property that Waller had bought from Williams, and which provided that the company should take title to 500 acres or more, paying therefor one-third of the stock of the company and buying the rest of the land upon certain stipulations, and Waller was to receive 50 per cent. of collections from the sale of lots, and Bates and Kitterman agreed to pay $1,250 each to be used as an expense fund, and Waller was to devote his time and energy to put matters in shape for an auction sale of lots about August 1st, and Waller was to receive $1,000, in cash for his expenses, which was to come out of the $2,500 which was to be jointly put up by Kitterman and Bates.

"(10) On the 29th day of June, when the deeds were deposited in the American National Bank at Austin, that is, the deed from Williams and wife to Waller, Waller agreed to deposit in the American National Bank, as soon as it could be returned from Pittsburg, Pa., which was to be in a few days, a deed from the American Mortgage Company to Williams, conveying him the 54 lots in the town of Penn City. Williams agreed that he would get abstract of title to the lands sold in Penn City, Tex., and they were then to exchange deeds.

"(11) Bates failed to pay his note at the bank and the note was renewed, something having been paid on it, but when the renewal took place nine or ten of the series of notes given by Waller to Williams had matured and were in default, as more than a year had elapsed since their execution. None of these were due when first hypothecated, and all remain in custody of the bank from the time it first received them or pledge till they were delivered to its attorney to be sold.

"(12) The notes which were transferred by Williams to Bates as part of his commission were notes Nos. 10, 21, 22, 32, 33, 43, and 44, the first being due a year after date, the next two, two years after date, the next two, three years after date, and the next two, four years after date.

"(13) The bank, under and by virtue of the provisions of the collateral note, offered the seven notes that Williams had transferred to Bates for sale to the highest bidder at the office of Robert E. Goree, his attorney, and Bates went to R. W. Houk, Esq., a reputable lawyer, and sought to make arrangements to have the notes bought in, first trying to borrow money to take them up, but Houk being unable and unwilling to do that, went to the plaintiff Bute and asked him if he would buy them in, Houk telling him that he thought he would get good title. To use Bute's language, 'He took a flier at it,' and, upon Houk's telling him that it would take about $600 to buy them, gave Houk his check for $600 or perhaps his blank check authorizing Houk to fill it up.

"(14) A number of parties bid at the sale and the notes were knocked off for $800, and Houk bought them for Bute. He paid $613 to satisfy the debt. The balance, difference between $613 and $800 being $187, was never accounted for in the transaction.

"(15) After they had been so bought in, Bates and Bute made what seems to me to be a remarkable contract. It provides, in substance, that it witnesseth that Bute has purchased seven certain vendor's lien notes executed by C. C. Waller, payable to the order of Williams, each for the sum of $500, all dated June 29, 1910, for the amount of $611.50, which I suppose means the amount Bute actually paid, and they make an agreement that Bute will undertake the collection or sale of said notes, and, after he gets back the amount he paid for the same and amount of costs and expenses incurred in the sale and collection, he agrees to divide equally with said Bates the said profit derived from said notes, and in consideration of that promise Bates agrees to pay the attorney's fees that may be charged by the attorney

for attending to the same at which the said notes were purchased.

"(16) In that agreement there is no reference made as to how the notes came to be purchased or any reason given why Bute should give Bates one-half of the notes he had purchased in open market, and, so far as the phraseology of the agreement is concerned, it reflects that Bute had taken the chance on buying certain notes, and, from other evidence in the case, I deduce that he knew there would be a litigation, and that without any consideration, except that Bates would pay the fee of the attorney who attended to the sale, Mr. Houk, he gives Bates a half interest in the net proceeds of the venture, when, so far as the agreement shows, there was no obligation on his part to do, and no evidence that Bates had before that time had anything to do with the notes, from which fact, and from the further fact that Mr. Houk was representing both Bates and Bute, I conclude that the notes were purchased by preconceived agreement between Bates and Bute, and $3,500 worth of vendor's lien notes held against property worth, according to the terms of the sale, $150,000, and worth intrinsically I should say, at least $50,000, was sold for six hundred and odd dollars. The $143,895, as set forth in finding 5, was also a lien on said property.

"(17) From these facts, viz., the fact that Waller and Bates had made an agreement to go into the venture based upon the purchase, and that Bute and Bates had gone into a common venture in buying the notes, I conclude that they were so acting together as to constitute Bates and Waller partners as to the townsite proposition, and to constitute Bates and Bute partners from the incipiency of the plan of buying the notes.

"(18) As I have said, the Penn City proposition totally failed, and the land went back to the vendors of that corporation, and hence the $50,000 bonds of the American Mortgage Company became worthless and the lots became worthless, and Waller was unable to carry out his contract with Williams, and stood ready and offered to cancel it and have it held for naught, and to take back his notes and have them canceled.

"(19) After Bute came into possession of the notes by virtue of the sale, the attorney of Williams heard of it and sent for Bute and asked him how much he had paid for the notes. He said in the neighborhood of $1,000, Bute explaining upon the stand that he didn't feel called upon to make any exact statement about it, and some negotiations took place or were attempted looking to a settlement, and Bute was asked how much he would take, and he said he thought the land had been put in in the contract for about one-third more than it was worth, and he would be willing to scale the notes or scale what he would take correspondingly, and would take, if I recall rightly, about $1,600. Captain J. C. Hutcheson, attorney

for defendant Williams, stated that, if he (Bute) would take $1,250, he would advise client to pay it, and Bute said that did not interest him, and Bute went to see one Col. E. W. Cullen, who was a surety on Bates' note to the bank, and, as I conclude, suggested to him that he need not tell exactly the terms or the price that Bute had paid for the notes.

"(20) I do not deem it necessary to make any finding that Bates, in making representations to Williams, did so fraudulently, for, on the contrary, I am inclined to the conclusion that he did not, but he had never known Waller before, and Waller had never known Williams, and Williams did not know Bates, by which I mean they were all practically strangers to each other, having known each other but a very short time; but Bates evidently relied upon Waller's statements, and Waller, with a mind filled with visions of wealth to be derived from the Penn City venture, lead Bates to believe that he was able to carry out a contract of the magnitude of that contemplated, and I find Bates so represented the facts to be to Williams and that Williams relied upon such statements of Bates and was thereby induced to enter into the contract with Waller.

"(21) I find further that, when Williams and Waller went up to look at the lands, Williams discovered that Waller did not have the actual money to pay down and to build the railroad both, but Williams was satisfied to take the lots in lieu thereof, property which, as I recall, he had never seen, and when the lots were found to be incumbered he was willing to take the $50,000 7 per cent. bonds of the American Mortgage Company to protect himself.

"(22) Bates' claim is that he negotiated the sale to Waller in the sense that he found Waller as a purchaser of the land, and that thereby he earned his commission.

"(23) On the other hand, the contention of Williams is that Bates, by reason of the fact that he relied upon Waller's statements to him, or by reason of Bates' recklessness and fraudulent purposes, represented to him (Williams) that Waller was willing to carry out the contract and was able to do so, and that he relied upon that fact, but that in fact Waller was not able to carry out the contract, did not carry it out, therefore Bates did not earn anything, and ought not to recover on the notes.

"(24) It may be stated here, in passing, that Bates has sued Williams for $4,000 of other notes necessary to make up the total of the $7,500, which he claims as commission.

"(24) Bute claims to be an innocent purchaser of the notes before maturity, but, if this is true, it must be because if notes are pledged for a debt before their maturity, and the debt is then extended at a time after the notes have matured, and they are repledged, they are to be treated as a continu-

ation of the former pledge in the first place, and the doctrine of innocent purchaser applies, because the second note given by Bates and his sureties to the bank, as an extention of the debt, was given at a time when nine and possibly ten of the notes had matured, and each and all of them, as I have said, gave the holder the option to mature the whole series.

"(25) Bates claims that ne is entitled to recover because he earned his commission, and Bute says that, if Bates :˜ entitled to recover, he is entitled, as successor to all the rights that Bates had, to recover and have the notes enforced as a lien on the land.

"(26) Williams, the defendant, says that neither of them are entitled to recover, and that he is entitled in equity to have all the notes canceled and cloud removed from the title to the land."

[1] The appellant devotes the first 17 pages of his brief to a "brief statement of the nature and result of suit," and the first five assignments of error ·complain of findings by the trial court without pointing out wherein the findings are wrong. And in his attempted statements, subjoined to his assignment, he makes no reference to the record, but refers this court to the statement made in the brief. This is such disregard of the rules of briefing that the assignment cannot be considered. Weil v. Martinez, 57 Tex. Civ. App. 440, 124 S. W. 116; 2 Michie Enc. Dig. p. 247 et seq. Said assignments are as follows:

"Appellants' First Assignment of Error Submitted as a Proposition: The court erred in holding that Bates had misrepresented the facts as to Waller's wealth or ability to carry out a purchase of the land; submitted as a proposition. (As shown in paragraph 2 of motion for new trial, Tr. 66.) (Tr. 84.)"

"Appellants' Second Assignment of Error: The court erred in holding that the representations of Bates as to Waller's wealth and ability were representations of fact and not opinion. (As shown in paragraph 3 of the motion for a new trial, Tr. 67.) (Tr. 85.)"

"Third Assignment of Error Submitted as a Proposition: The court erred in holding that Williams relied on Bates' representations as to Waller's wealth, as the evidence showed· that Williams had been informed and knew Waller's true financial condition. (As shown in paragraph 4 of motion for new trial, Tr. 67.) (Tr. 85.)"

"Fourth Assignment of Error Submitted as a Proposition: The court erred in holding that the representations of Bates as to Waller's ability were material. (As shown in paragraph 5 of motion for new trial, Tr. 67.) (Tr. 85.)"

"Fifth Assignment of Error: The court erred in holding that Bates would not have been entitled to recover had he still been the owner of same (notes). (As shown in

paragraph 6 of motion for new trial, Tr. 67.) (Tr. 85.)"

[2] The facts of this case justify the finding by the trial court that, by reason of the false and reckless statements of Bates and Waller, Williams was induced to make the sale of the land and accept all notes for the consideration therefor, and same are now valueless. It therefore follows that Williams is entitled under the law to judgment as rendered, canceling his deed to Waller and including cancellation of notes and vendor's liens, except such notes as may be in the hands of innocent purchasers for value before maturity. This observation disposes of the 11th, 12th, 13th, 14th, 15th, and 16th assignments.

This brings us to the question of the right of plaintiff Bute, as an innocent purchaser, to recover on the series of notes given to Bates for commissions, on sale. Total or partial failure of consideration may be insisted upon as a defense between any of the immediate original parties to the contract; so, since the original sale was without consideration (notes given being valueless), and since the sale was brought about by the false and reckless statements of the agent, Bates, he, in equity and good conscience, ought not to be permitted to recover in any event. While the court finds that Bates acted in good faith while acting as agent in bringing about the sale of the land by Williams to Waller, he further finds that the statements of Waller were false and recklessly made, and that Bates repeated such statements to Williams, intending them as an inducement, and which evidently did induce the sale of the land to Waller without consideration, in effect, no sale at all, and therefore Bates should not recover anything for commissions for· bringing it about. The statements need not be fraudulently made, if false, even though Bates believed them to be true; if they induced Williams to make the sale, he (Bates) cannot claim any benefit. Loper v. Robinson, 54 Tex. 515.

[3] But we are confronted with the proposition of plaintiff's (Bute's) right to recover as an innocent purchaser for value from the bank. The bank having acquired this series of notes as collateral for a loan then made before maturity, as raised by appellant's sixth assignment, which complains "that the court erred in not holding that the bank, after the renewal of the loan, was an innocent holder or purchaser of the $3,500 collateral notes, and, by· its sale of same, passed the title free from equities that might be asserted by Williams." The proposition being that: "Where a bank is an innocent holder of notes given as collateral for money then loaned, before maturity, and after the hypothecation the collateral notes become due, and after the debt to the bank became due, the loan is renewed, or the time of its payment is extended, the fact that the collateral notes had become due in the meantime and the re-

tention of the collateral notes as security for the new note to the bank would not change the legal status of the bank as an innocent purchaser, nor the right of the bank to pass good title to the collateral security notes to a subsequent vendee." A partial or total failure of consideration or even fraud between the original parties will be no defense or bar to the title of a bona fide owner or holder for a valuable consideration before it becomes due, without notice of the infirmity. The same rule applies to the purchaser from such bona fide holder for value, although he have such notice of infirmity. But, in the latter case, the purchaser succeeded to no more than the rights of the person from whom he purchased. In the instant case, although the notes in Bates hands are void by reason of fraud and failure of consideration, the bank, by reason of taking them as collateral before maturity for money then loaned, acquired an interest therein to the extent of the loan. Watson v. Flanagan, 14 Tex. 354; Anderson v. Bank, 98 Mich. 543, 57 N. W. 808; Wright v. Hardie, 88 Tex. 653, 32 S. W. 885. The finding by the trial court that the bank was not an innocent holder for value is not supported by any evidence.

[4] The bank having the right to collect the amount due it from Bates by sale of the notes, and Bute having purchased them, is he entitled to recover in this action the amount of Bates' debt to the bank at the time of the sale or $500 and interests from the date of the note up to the time of sale? Appellee contends that he is not because of the finding of the trial court that "From the facts that Bute and Bates made an agreement to go into a common venture in buying the notes, I conclude that they were acting together in such way as to constitute them partners in the purchase of the notes" had the effect of discharging the debt by Bates himself.

The rule is uncontroverted that the payee of a note which has been procured by fraud, or as to which there are defenses between the original parties, either based upon fraud or illegality of consideration, cannot, after the transfer of the note to an innocent purchaser for value, repurchase same and enforce it against the maker stripped of its defenses in favor of the maker. Elwell v. Tatum, 6 Tex. Civ. App. 397, 24 S. W. 71, 25 S. W. 434.

There is some difficulty in determining just what the trial court meant by his finding that they were partners, but, taken in connection with the finding of facts lead ing up to the final designation of the effect of all the acts of the parties, it seems clear that what he meant by partner was, in fact, that Bates was the purchaser of the notes; for it is the inevitable conclusion from the findings of facts as detailed by the trial court that Bates secured his notes, and Bute, after getting his money actually paid back,

was to share in the profits for the loan of the money. It follows, therefore, that, as the purchaser, he (Bates) takes with Bute the notes with all the defenses against them that Williams has against Waller, including the cancellation of the vendor's lien against the land and defendant Williams' title thereto.

The second proposition under the sixth assignment is not supported by proper statement and for that reason, not considered. This disposes of the tenth assignment, which was that the court erred in holding that the hypothecation of said notes to the bank and the subsequent renewal of the indebtedness by Bates to the bank was not one continuous transaction. Goodson v. Johnson, 35 Tex. 622; 7 Cyc. p. 936.

The appellant charges in his seventh, eighth, and ninth assignments that the court erred in holding that Bute and Bates were partners, and that Bute had notice of any interest Bates might acquire by reason of the contract to divide profits. What has been said under sixth assignment disposes of all these questions.

Finding no error in the record, the judgment of the trial court is affirmed.